### HETRICK v KROEGER

Ohio Appeals, 2nd Dist, Montgomery Co

No 1499. Decided July 19, 1938

Thomas, Hyers, Leyland & Stewart, Dayton, for plaintiff.

George E. Nicholas, Dayton, for defendants.

## OPINION

By BARNES, PJ.

The above entitled cause is now being determined de novo by reason of plaintiff's appeal on questions of law and fact from the judgment of the Court of Common Pleas of Montgomery County, Ohio.

The case is presented on plaintiff's amended petition, separate answers of the two defendants, and plaintiff's reply, together with transcript of the evidence taken in the court below.

Plaintiff seeks to have his deposit of $3199.71, carried on the books of the Building & Loan Association as a running stock account, decreed to be a deposit account and thereby entitled to preference over those of stockholders of said association.

The following brief statement of facts will render understandable the nature of the controversy.

Prior to June 30, 1930, and probably July 14, 1930, plaintiff had a running stock account in the Buckeye Building & Loan Association, of Dayton, Ohio, in the sum of $2624.95. Sometime in April, 1930, the pleadings state that there was a merger between the Buckeye Building & Loan Association of Dayton, Ohio, and the defend-

ant the Miami Savings & Loan Company, of Dayton, Ohio. In plaintiff's original petition he alleges the merger between the two associations and "that by the terms of said merger plaintiff became a shareholder in said Miami Savings & Loan Association." In the amended petition the above quoted portion is omitted. In the case of Dr. Smith v The Miami Savings & Loan Company, of Dayton, Ohio, and others, recently decided by our court, we had before us the contract between the two associations and thereby happen to know that it was not a merger at all but an outright sale of the assets of the Buckeye Building & Loan Association to the Miami Savings & Loan Company.

Of course, we must accept the pleadings in the instant case as presented, and may not substitute therefor any facts within our independent knowledge. However, we think the question is immaterial, since on either June 30 or July 14, 1930, a new transaction was had between the plaintiff and the Miami, and plaintiff's status will necessarily be controlled by this new transaction.

Plaintiff states that he took no part in the transaction between the Buckeye and the Miami, either by direct vote or proxy; that a notice in the newspapers that the deal had been completed was published, and that on July 14, 1930, he went to the place of business of the Miami for the purpose of withdrawing his funds and placing them with the Union Trust Company. He first contacted a man on the floor, and was directed to a certain man behind a cage, whom he did not know at the time but afterwards learned was Mr. Harry T. Haacke. Mr. Haacke's position with the Miami was that of teller in what was designated Unit No. 1. Mr. Haacke has no independent recollection of his talk with the plaintiff or the details of the transaction under which a new pass book was issued.

Plaintiff states that he presented his Buckeye stock book, with request for withdrawal of the entire amount, and thereupon was interrogated by Mr. Haack as to why he desired to withdraw the fund. Plaintiff's contention as to the conversation may best be stated by setting out in full and verbatim his testimony. Starting on page 9 of the bill of exceptions we find the following:

"Q. Now state the conversation you had with Mr. Haack on July 14, 1930.

A. Well, as I said before, I presented this book to him and said I wished to draw this money out and he asked me my rea-

sons for it and I told him I didn't care for it to be that kind of an account no longer. He said, 'what are you going to do with it?' I told him I was going to put it in the Union Trust. He said 'why not leave it here. I can give you a preferred claim here in the savings account.' So, of course, he gained my confidence and I left it there as a savings account.

Q. Did the man whom you now identify as Mr. Haack at that time show you any other type of pass book besides this Buckeye Book which you have?

A. He showed me the one which I have. He showed me the one issued to me. This here one.

Q. At the time of your conversation with Mr. Haack, did you sign any papers of any sort on that day, that is July 14, 1930?

A. None at all.

Q. Were you asked to sign any papers by Mr. Haack?

A. No.

Q. After you had received the book from Mr. Haack did you have any conservation with him about it?

A. After I received· it? Q. Yes.

A. No. The transaction was completed when he handed me the book. I left.

Q. When did you next go to the Miami Savings & Loan Company office, Mr. Haack?

A. The 10th of March next year to make a deposit of $353.71, I think.

Q. And what did you do on the 10th of March at that window?

A. Well, I had interest coming and I handed him my book to have the interest entered and with that why I told him that I wanted to even that account up to $3200.00, and I made a mistake of twenty-four cents. I missed it by twenty-four cents of making it $3200.00 even.

Q. Did you ·have any conversation with Mr. Haack at that time other than what you have just testified to?

A. No, not at that time."

On July 11, 1931, the witness testifies that he again went to the Miami to have his interest entered in the book.

Again on page 37 of redirect examination, plaintiff is being interrogated as to the identity of the pass book issued by the Miami:

"A. I couldn't say whether the first one I saw was that book or not. He showed me where a savings account, where you could draw any amount you wanted to. It was not like a certificate of deposit. I could put in and take out any time I wanted to. He says to me, 'If you want $5.00 for a pair of shoes'—that is his course of conversation to me, 'or you want $20.00 for a suit of clothes, or you may want to put in $20.00, either way, this makes it the handiest', he said.

Q. Was there any conversation between you and Mr. Haack about a certificate of deposit?

A. I told him I didn't care to have a certificate of deposit, because I maybe would want to draw out ten or twenty· dollars or a certain amount, small amounts or put in, and I wouldn't want to be bound by a certificate of deposit, still I wanted a preferred claim.

Q. What did he say?

A. This took the place of it. This was practically the same, to his explanation to me. He· was explaining this.

Q. Did he have this green book in his hand?

A. He showed me this book, is what he was demonstrating to me that was a savings account, and that made a deposit account out of it, that there was no need of me taking my money out of there, and putting it in the Union Trust at a less interest rate."

On page 39, recross examination by Mr. Nicholas:

"Q. How long were you there talking to him?

A. Oh, practically ten or twelve or fifteen minutes. No longer than it would take for a transaction of that kind.

Q. What did you say about a certificate of deposit being mentioned? Who mentioned that?

A. Well, I did. I told him my mother had a certificate of deposit. I settled up the estate. It was five hundred and some dollars, into this Buckeye on five and one-half per cent, but if you wanted to draw a little money, you had to take this certificate down. You had it laying around, and you had the danger of losing it or somebody stealing it and I told him I didn't know when I will need part of this, whether it be five, ten or twenty, just as I called it— 'I may need five or ten or twenty for a pair of shoes' and he said this 'savings deposit' as he called it, I could draw any amount any time or put in anything.

Q. How long had you known about certificate of deposits then?

A. How long had I known? Q. Yes.

A. I took care of this one of my mother's in 1923 in the Buckeye Building & Loan Association and settled up the estate.

"Q. And at the same time you had a running stock account?

A. Same time, yes.

Q. In the Buckeye? A. Yes."

Of course, we have examined all the testimony of this witness, as well as that of others, but we think the above presents a correct picture of what ██ plaintiff claims the conversation was at the time the pass book was issued. Witness Haack makes categorical denial of all parts of conversation wherein he is accredited with saying, in substance, that the account was accepted as a deposit account, although he says he has no independent recollection of plaintiff or any conversation. Plaintiff further states that he never received any notice of a stockholders' meeting. He did receive a letter from Mr. Waitman, vice-president and general manager of the Miami, the same being dated February 5, 1931, which is attached as plaintiff's Exhibit C. Mr. Hetrick was addressed as "dear patron." There is nothing in the letter indicating Mr. Hetrick's status. The pass book is introduced in evidence as plaintiff's Exhibit B. On the front cover appears the legend "Savings Account." Nothing in the book at any place designated that it was a running stock account. The entries in the proper column bear dates 6-30-30; 3-10-31; 3-10-31; 7-11-31. In the second column, under the heading "Withdrawal," and immediately following 7-11-31, appears, apparently by stamp, "Div. June." The evidence conclusively shows there was no withdrawal.

In the next column headed "Deposit," appears in line with the second 3-10-31, the figures 353.75.

In the next column, under "Balance," appear four entries, which it is unnecessary to set out.

The next column is headed "Interest or Dividend," and under this appear three items, plaintiff claiming that they were entries of interest and defendant claiming that they were entries of dividend.

Following is a column without heading with four separate symbols on line with the respective dates and the respective balance. In three instances they appear DC. The other symbol is SR P. Defendant testifies that the symbol DC means dividend credit. Plaintiff says that he did not know its meaning.

The first entry in this savings account is listed under date of 6-30-30, $2690.55, and under "Interest or Dividend," $65.60. Plaintiff's balance in the Buckeye Building &amp; Loan Association at the time it went out of business was $2624.95. This amount plus the $65.60, would total $2690.55.

On this Buckeye running stock book, on the same page where the above balance appears, there appears in stamps, "Cancelled;" also in stamp "Miami Savings &amp; Loan Co., July 14, 1930." The variance between the dates 6-30-30 and July 14, 1930 is possibly explained through the evidence of a Mrs. Campbell, who was head bookkeeper for the Miami Savings, that these pass books may have been made out immediately following the transaction between the Buckeye and Miami, and thereafter placed with the tellers in the proper cages, awaiting the time when the owner of the account would call.

The Miami went on notice prior to July 11, 1931. It was taken over for liquidation by the superintendent of Building &amp; Loans on April 18, 1933.

The Miami under its by-laws was authorized to receive deposit accounts, although Teller Haack testifies that at the time of the transaction with the plaintiff they had received instructions from the heads of the institution not to take book deposit accounts. According to his testimony they were limited to stock certificates, running stock accounts and certificate of deposit accounts. However, there had been no modification in the by-laws nor were these orders evidenced by the minutes of the board of directors. Plaintiff testifies that none of these facts were known to him.

The defendants presented in evidence defendants' Exhibit 4 being photostatic copy of ledger card of the Edward Hetrick account. Nowhere on this page does anything appear listing the account as a running stock account. The columns and headings are similar to plaintiff's savings account book, except in the pass book one column is headed "Interest or Dividend," whereas on the photostatic copy of ledger sheet it is headed "Dividends." In fact, this is the only writing, typewriting or printed matter on the entire page through which it might be inferred that it was running stock. It could be reasoned that dividends were only payable on running stock or stock certificates, and not on deposit accounts. Of course, this sheet was not in the hands of the plaintiff but was at all times in the possession and control of the defendant.

According to Mrs. Campbell, head bookkeeper of the Miami, signature cards were prepared for all of the accounts of the Buckeye after the merger or take-over, and were all distributed to the unit they be-

longed in and held there. It was her opinion that the signature card, blank ledger card, posted and new book were distributed to the proper teller before the original customer came in.

No signature card or consent to transfer was presented to plaintiff. It was stated in evidence that this was not always done where the customer was unable to come to the institution or where they lived out of the city. This situation would not apply to the plaintiff, for the reason that he lived in Dayton and did go to the association and received his new pass book there.

Many other facts disclosed from the bill of exceptions might be stated, but we think we have substantially given the correct picture from which may be gleaned the claims of the respective parties.

We now approach the question as to what we should do under this situation.

We have no difficulty in arriving at the conclusion that the Miami's method of identifying its accounts is not to be commended.

In the first place, the words "savings account" would never suggest to anybody outside of the institution that they meant running stock account. These words "savings account" have a well defined meaning and standing alone would never mean an investment. Running stock is an investment. Plaintiff, if he is to be believed, made it very clear to the teller that he wanted a deposit account and not a running stock account. His narrative rings true. It is passing strange that the teller did not follow the usual methods and procure from the plaintiff his signature and consent to transfer to a running stock account, if that is what it was to be.

The query is also raised as to why a proper pass book would not have been given to plaintiff, showing on its cover or some of its pages that it was a running stock account. True, it was testified to by a witness for the defendant that this was the only type of book they had. We do not think that this is an excuse. An institution of the size of the Miami certainly could have provided itself with appropriate books to be handed out to its customers, or in the alternative could have changed the marking so as to show a stock running account, if that is what it was intended to be. It is stretching the imagination to a considerable limit in order to determine from the ledger account of the defendant association that plaintiff's account was a running stock account. They ask that the word "dividend" bind the plaintiff when

he had no means of knowing, and on the other hand urge that the words "savings account" on the back of the book, mean nothing in support of plaintiff's contention.

On the question of estoppel, we find nothing of substance through which plaintiff should have known that the defendant association was carrying his deposits as a running stock account. If the plaintiff was a stockholder, why was he not given notice of stockholders' meetings? He says he never received any such notice and no evidence is presented to the contrary. The symbols in the book DC, mean nothing. These might indicate the initials of the employee of the bank who made the entries. It is testified to by employees of the bank that it means divided credit, but we can not charge plaintiff with the knowledge of this meaning when he testified that he did not notice them nor did he know their meaning. In just one place on plaintiff's deposit book, under the heading "Withdrawals" there appear the words "Div. June." This isolated designation in an improper column, is not in our judgment sufficient to place plaintiff on notice. That was an improper column because there were no withdrawals. Why did not the defendant scratch out the word "Interest" where appear "Interest or Dividend?" Why were not the symbols following in the last column under no heading stamped with the usual designation Div. instead of D.C.? In our experience we have never seen the symbols DC before as indicating dividend.

It is our judgment that the plaintiff has by an abundance of evidence and to the degree of proof required under the law, established his case and is entitled to the relief prayed for. Entry may be drawn accordingly.

HORNBECK and GEIGER, JJ, concur.